UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NEDSCHROEF DETROIT
CORPORATION,
NEDSCHROEF HERENTALS
N.V., and KONINKLIJKE
NEDSCHROEF HOLDING
B.V.,

               Plaintiffs,

v.                                                        Civil Case No. 14-10095
                                                         Honorable Linda V. Parker

BEMAS ENTERPRISES LLC,
MARC A. RIGOLE, and
BERNARD E. LEPAGE,

               Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs initiated this lawsuit after discovering that Defendants Marc A.

Rigole ("Rigole") and Bernard E. LePage ("LePage"), former employees of

Plaintiff Nedschroef Detroit Corporation ("Nedschroef Detroit"), had formed a

competing company, Bemas Enterprises LLC ("Bemas") while still working for

Nedschroef Detroit.  According to Plaintiffs, Rigole and LePage used Plaintiffs'

equipment, personnel, and trade secrets to start up and run Bemas.  Presently

before the Court is Plaintiffs' motion for summary judgment, filed pursuant to

Federal Rules of Civil Procedure 56 on February 16, 2015.  The motion has been fully briefed.  Finding the facts and legal arguments sufficiently presented in the parties' pleadings, the Court dispensed with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f) on April 30, 2015.  For the reasons that follow, the Court grants summary judgment to Plaintiffs on all but two of their claims.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual and Procedural Background

Nedschroef Herentals, N.V. is a Dutch manufacturer of industrial machines that produce metal fasteners, such as nuts, bolts, and screws.  Dozens of North American fastener manufacturers use those machines.  In order to service and provide replacement parts for the machines, Nedschroef Detroit was formed as a Michigan corporation in approximately 1991.  Nedschroef Detroit and Nedschroef Herentals are subsidiaries of Nedschroef Holding B.V. (collectively "Nedschroef").

3

Rigole was assigned to run Nedschroef Detroit when it first opened.  (Pls.' Mot., Ex. 2 at 13-16.)  He served as the manager of Nedschroef Detroit from 1991-1996 and from 2004-2013. As the manager, Rigole was the highest ranking Nedschroef employee in North America, and supervised the other Nedschroef Detroit employees.  (*Id*. at 16, 27-28.)  Rigole's job duties included servicing Nedschroef machines and providing replacement parts for those machines.  Rigole had the authority to issue quotations, order replacement parts from suppliers, enter into contracts, and sign checks on behalf of Nedschroef.  (*Id*. at 27.)  He also had access to Nedschroef's passcode-protected proprietary part design drawings, customer lists, supplier lists, pricing information, and financial information.  (*Id*. at 19, 21-24, 28, 55-56.)

In 2005, LePage was hired to work as a project and service engineer for Nedschroef Detroit.  (Pl.'s Mot., Ex. 3 at 11.)  His job duties included servicing Nedschroef machines and providing replacement parts for those machines.  (*Id*. at 19-20.)  LePage also had the authority to issue quotations, order replacement parts from suppliers, enter into contracts, and sign checks on behalf of Nedschroef.  (*Id*. at 19-20, 23.)  He also had access to Nedschroef's passcode-protected proprietary part design drawings, customer lists, supplier lists, pricing information, and financial information.  (*Id*. at 20, 22, 27.)

4

In December 2010 or January 2011, Rigole, LePage, and other Nedschroef Detroit employees were informed that Nedschroef Detroit would be closed within a year unless its business improved.  (Pls.' Mot., Ex. 2 at 39-41, 74; Ex. 3 at 16-18, 31; Ex. 6 at 7.)  Employees, including Rigole and LePage, received a pay cut at this time.  (*Id.*, Ex. 2 at 40; Ex. 3 at 18.)  About a month later, Rigole, LePage, Rigole's wife Christine Van Looveren ("Van Looveren"), and LePage's then girlfriend and now wife Cynthia Lupo ("Lupo"), began to discuss the idea of forming a company to service Nedschroef machines and supply replacement parts for those machines purportedly in the event that Nedschroef Detroit closed.  (Pl.'s Mot., Ex. 2 at 39-40; Ex. 3 at 31, 36; Ex. 4 at 9; Ex. 5 at 10.)  They formed Bemas a few months later, in about June 2011, naming Van Looveren and Lupo as its owners.  (*Id.*, Ex. 6 at 6.)

According to Rigole, Bemas was formed under Van Looveren's and Lupo's names instead of Rigole's and LePage's names because an unidentified lawyer advised them that it was illegal for Rigole and LePage to open the company under their own names.  (Pl.'s Mot., Ex. 2 at 42-43.)  As reflected in Van Looveren's and Lupo's deposition testimony in this matter, they in fact never participated in the daily operations of Bemas and know little about Bemas' business.  (*Id.*, Ex. 4 at 14-19, 24-25, 30; Ex. 5 at 9-17.)  LePage acknowledged during his deposition that

Van Looveren and Lupo were "not really active" in the business of Bemas and that they probably never sent an email from Bemas' address.  (*Id.*, Ex. 3 at 40, 56.)

Rigole and LePage began selling goods and performing services on behalf of Bemas beginning in mid-June 2011, while they were still employed by Nedschroef Detroit.[1]  The goods sold were replacement parts for Nedschroef machines and the services performed were on Nedschroef machines.  (*Id.*, Ex. 2 at 204-05; Ex. 3 at 46-47.)  Dozens of purchase orders, quotations, and invoices reflect that Rigole and LePage, on behalf of Bemas, competed directly with Nedschroef Detroit from mid-June 2011 forward.  (Pl.'s Mot., Ex. 9; Ex. 2 at 119-73.)

Plaintiffs allege that Rigole and LePage used Plaintiffs' proprietary drawings of replacement parts in connection with Bemas' business.  Steven Woloszyk, a former Nedschroef Detroit employee, testified during his deposition that Rigole instructed him to create "Bemas" drawings from original Nedschroef drawings, despite the warnings on the latter drawings that they not be reproduced.  (Pls.' Mot., Ex. 13 at 35-39, 42-56, 67; Ex. 14.)  Plaintiffs also retained an expert in engineering and design, Thomas DeAgostino, who concluded that Bemas drawings

---

[1] During their depositions in this matter, Rigole and LePage initially denied working for Bemas while employed by Nedschroef Detroit.  (Pls.' Mot., Ex. 2 at 30, 32, 61, 70-72, 103; Ex. 3 at 39, 57.)  When confronted with documentary evidence disproving their testimony, however, Rigole and LePage admitted that they performed services for Bemas while still employed by Nedschroef Detroit.  (*Id.*, Ex. 2 at 34, 51-52, 57-58, 61-70, 81-83, 97-98, 112-115, 119-121, 125-129, 132-133, 135-174, 202-209, 220-222, 224-226; Ex. 3 at 40, 47-48, 56-59, 64-70, 73, 76-104, 115-119; Exhibit 6 at 17, 29-30, 74-75.)

6

could have been created only by copying Nedschroef drawings and were not
created through "reverse engineering"-- a process by which a drawing is created by
analyzing the part itself  (*Id*., Ex. 15.)  Plaintiffs also hired a computer forensic
expert who determined that Rigole and LePage downloaded multiple files from
their Nedschroef computers, including proprietary drawings.  (*Id*., Ex. 25.)

Rigole and LePage testified during their depositions, however, that any
drawings of parts were received from customers ordering parts from Bemas or
through reverse engineering.  (Pls.' Mot., Ex. 2 at 47-49, 54, 137-38, 199; Ex. 3 at
65, 66, 81; Ex. 6 at 17-18; 61-62, 6870; Defs.' Resp. Ex. 4 ¶ 4.)  Rigole attests in
an affidavit attached to Defendants' response brief that neither he nor Bemas
removed, kept, or maintained drawings of parts of the like from Plaintiffs.  (Defs.'
Mot., Ex. 4 ¶ 3.)  Rigole denies asking Woloszyk to make any drawings for Bemas
based on Nedschroef drawings.  (Pls.' Mot., Ex. 2 at 50, 108; Defs.' Resp., Ex. 4
¶ 6.)  According to Rigole, Woloszyk volunteered to create those drawings.  (Pls.'
Mot., Ex. 2 at 50, 108.)  In his affidavit, Rigole states that Bemas never used any
drawings made by Woloszyk for any purpose and that he believes Woloszyk made
the drawings in an attempt to obtain a job with Bemas.  (Defs.' Resp., Ex. 4 ¶¶ 8-
9.)

Plaintiffs also allege that Rigole and LePage obtained from Plaintiffs'
private server a list of all customers in North America that purchased a Nedschroef

7

machine-- the same customers which formed Nedschroef Detroit's customer list

for replacement parts and service.  (Pls.' Mot., Ex. 1.)  This list was available only

to authorized personnel on Plaintiffs' password-protected server.  (*Id*.)  At his

deposition, LePage acknowledged that such a list was maintained on Plaintiffs'

computer system (*Id*., Ex. 3 at 20); however, Rigole states in his affidavit that he is

unaware of such a list.  (Defs.' Resp., Ex. 4 ¶ 5.)  According to Rigole, through his

years working at Nedschroef Detroit, he has learned the names of the North

American companies with Nedschroef machines and has established "pretty good"

relationships with individuals at those companies.  (Pls.' Mot., Ex. 2 at 58.)

According to Rigole and LePage, when those individuals contacted them in

their capacity as employees of Nedschroef Detroit and expressed that Nedschroef

Detroit's price quote was too high or the delivery time too long for a part, Rigole

or LePage would tell the customer about Bemas and provide a quote for the part or

service from Bemas.  (*Id*. at 67-68; Ex. 3 at 47, 57, 58-59; Ex. 6 at 39.)  Rigole and

LePage maintain that they had little control over Nedschroef Detroit pricing, as

pricing decisions were made at the corporate level in Belgium.  (*Id*., Ex. 2 at 23,

72; Ex. 3 at 22-23.)   They had access to Plaintiffs' price list, however, and were

aware of how Plaintiffs calculated their sales prices.  (*Id*., Ex. 2 at 28; Ex. 6 at 24.)

LePage testified as Bemas' corporate representative that, when parts from Bemas

are cheaper than from Nedschroef Detroit, it is because Bemas' profit margin is not

8

as big.  (*Id*., Ex. 6 at 23-24.)  Rigole describes Bemas as thus "filling up a gap" that was created by Plaintiffs' excessive prices.  (*Id*., Ex. 2 at 204.)  It is not disputed that almost all of Bemas' customers were first customers of Nedschroef Detroit, and almost all of the goods and services offered by Bemas are offered by Nedschroef Detroit.  (*Id*. at 58, 64-70, 114, 116-17, 127, 133, 142, 144, 148, 167-68, 204-205; Ex. 3 at 46-47, 63-64, 74, 77-78, 80; Ex. 6 at 38-40.)

In addition to appropriating Plaintiffs' proprietary drawings and customer list, Plaintiffs allege that Defendants used Nedschroef Detroit's employees, equipment, warehouse and other resources to run Bemas and compete against Nedschroef Detroit.  For example, for the first two and a half years of Bemas' existence, Rigole and LePage conducted the company's business while employed by Nedschroef Detroit and using their Nedschroef-owned computers.  (*See, e.g.*, Pls.' Mot., Ex. 2 at 75-76, 157.)  Bemas documents reflect, and Defendants confirmed during their testimony, that suppliers shipped parts to Bemas at Nedschroef Detroit's warehouse, where Bemas would use Nedschroef Detroit's forklift to unload the goods and then ship them to Bemas' customers.  (Pls.' Mot., Ex. 23; Ex. 2 at 119-29, 140-41, 143, 148, 162-63, 165-55, 205-06; Ex. 3 at 64-65, 67, 81-93, 97, 104.)

Plaintiffs maintain that Rigole's and LePage's work for Bemas while employed by Nedschroef Detroit, ordering the same replacement parts from the

same suppliers and offering the same goods and services to the same customers on behalf of Bemas and Nedschroef Detroit, led to customer confusion.  As evidence of this confusion, Plaintiffs point to an email exchange between Rigole and Rich Wojtasik from Orttech.  On March 15, 2012, Rigole wrote Wojtasik:

> Hi Rich,
> The drawing #1A 643A 041977 for the bore of the clutch is ok (approved)
> Please do not send emails concerning Bemas to my Nedschroef email address.
> Thanks and Regards
> Marc

(Pls.' Mot., Ex. 20.)  Wojtasik responded:

> Marc,
> The 0400 size 85 is a Nedschroef order, is it not? Greg quoted this to Nedschroef and I assumed this is who we sold it too [sic], so PO 2012-120-5035 is for Bemas?

(*Id*.)  On October 18, 2013, Todd Miller of Kamax sent "Nedschroef Order PO 400005267" to Bemas.  (Pls.' Mot., Ex. 21.)  When asked if it looked like Kamax was confused, LePage answered: "Most definitely."  (Pls.' Mot., Ex. 3 at 106.)  LePage and Rigole identified other instances where suppliers appeared confused with respect to the business with which they were dealing.  (*Id*. at 75-76, 98, 106-07; Ex. 2 at 148-49, 166-67, 177.)

After discovering their competing business, Nedschroef terminated Rigole's and LePage's employment on July 17, 2013.

10

According to Plaintiffs' expert in financial valuation and economic damages, Andrew M. Malec, Ph.D., from the time they started Bemas until their termination from Nedschroef Detroit, Rigole was paid $281,143 in wages and LePage was paid $286,749 in wages. (Pls.' Mot., Ex. 26 at 4.) Malec concludes that Bemas' net profits from 2011 through the end of 2013 were $393,971. (*Id*.) Malec calculates Plaintiffs' total damages through December 31, 2013 to be $961,863. (*Id*. at 5.) Plaintiffs indicate that Defendants provided insufficient discovery responses and thus did not provide all documentation relevant to computing damages. For example, LePage failed to produce his W-2 for 2011 and no financial documentation for 2014 was provided.

In their Complaint, Plaintiffs assert that the above-described conduct by Defendants constitutes:

(I) false designation/false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a);

(II) violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901 et seq.;

(III) violation of the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1902;

(IV) unfair competition;

(V) conversion;

(VI) statutory conversion, Mich. Comp. Laws § 600.2919a;

11

(VII) tortious interference with Plaintiffs' business relationships and/or expectancies of business relationships;

(VIII) unjust enrichment;

(IX) civil conspiracy;

(X) breach of duty of loyalty by LePage and Rigole; and,

(XI) breach of fiduciary duty and misappropriation of corporate opportunities by LePage and Rigole.

(ECF No. 1.)  In their pending motion, Plaintiffs seek summary judgment with respect to all counts of their Complaint and ask the Court to enter an award of damages and a permanent injunction precluding Defendants from providing replacement parts and services for Nedschroef machines in North America.  With respect to damages, Plaintiffs ask that any award include interest, treble damages, and attorney's fees pursuant to Michigan's conversion statute, Michigan Compiled Laws Section 600.2919a.

## III.   Applicable Law and Analysis of Plaintiffs' Claims

### A.   Misappropriation of Plaintiffs' Corporate Opportunities & Breach of Fiduciary Duty & Duty of Loyalty

During their employment, Rigole and LePage were agents of Nedschroef Detroit.  *See Credit Acceptance Corp. v. Dep't of Treasury*, 601 N.W.2d 109, 112 (Mich. Ct. App. 1999) (quoting *Stephenson v. Golden*, 276 N.W. 849, 857 (Mich. 1937) (defining an "agent" in part as "one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage

12

some affairs for another by authority and on account of the latter, and to render an

account to it . . . .")).  "Under principles of agency, an agent owes his principal a

duty of good faith, loyalty, and fair dealing." *H.J. Tucker & Assoc., Inc. v. Allied*

*Chucker & Eng'g Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999) (citing *Burton*

*v. Burton*, 51 N.W.2d 297, 303 (1952)).  The Michigan Courts have held that these

duties prohibit an agent from "act[ing] for himself at his principal's expense during

the course of his agency."  *Central Cartage Co. v. Fewless*, 591 N.W.2d 422, 426

(Mich. Ct. App. 1998) (citing *Prod. Finishing Corp. v. Shields*, 405 N.W.2d 171,

174 (Mich. Ct. App. 1987)).  The Michigan Supreme Court has explained:

> "[A]s to engaging in other business, it is an elemental rule of
> agency that his duties required his efforts and activities in the line of
> his employment should be for the benefit of his principal, and he was
> not at liberty to deal in the business of his agency for his own benefit.
> It was his duty to communicate to his principal facts relating to the
> business which ought in good faith be made known to the latter. . . .
>
> The well settled and salutary principle that a person who
> undertakes to act for another shall not, in the same matter, act for
> himself, results also in the other rule, that all profits made and
> advantage gained by the agent in the execution of the agency belong
> to the principal. And it matters not whether such profit or advantage
> be the result of the performance or of the violation of the duty of the
> agent if it be the fruit of the agency."

*Prod. Finishing*, 405 N.W.2d at 174 (quoting *Mich. Crown Fender Co. v. Welch*,

178 N.W. 684, 688 (Mich. 1920)) (internal quotation marks omitted).  The Court

subsequently stated: "[T]he law will not permit an agent to act in a dual capacity in

which his interest conflicts with his duty, without a full disclosure of the facts to

his principal." *Sweeney & Moore v. Chapman*, 294 N.W. 711, 712-713 (Mich. 1940). "Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition." *In re Sullivan*, 305 B.R. 809, 819 (Bankr. W.D. Mich. 2004).

Defendants argue that they did not usurp any of Plaintiffs' corporate opportunities because "Bemas would only provide parts and/or service to Nedschroef machines if customers previously requested a quote for the same part or service from Nedschroef and the quote was rejected by the customer." (Defs.' Resp. Br. at 3.) Thus, Defendants maintain, "Bemas was not in any way in direct competition with Plaintiff[]" and "[n]o evidence has been provided to show that Bemas took any business from Plaintiff." (*Id*.) Even if true, however, Michigan case law establishes that LePage and Rigole breached their fiduciary duties and misappropriated Plaintiffs' corporate opportunities. *Prod. Finishing*, 405 N.W.2d at 175; *Rapistan Corp. v. Michaels*, 511 N.W.2d 918 (Mich. Ct. App. 1994) ("[W]hen a corporation's fiduciary uses corporate assets to develop a business opportunity, the fiduciary is estopped from denying that the resulting opportunity belongs to the corporation whose assets were misappropriated, *even if it was not*

14

*feasible for the corporation to pursue the opportunity or it had no expectancy in the project*.") (emphasis added).

In *Production Finishing*, the plaintiff provided goods and services to the automotive industry, which included the service of steel polishing.  405 N.W.2d at 172.  The plaintiff did most of the polishing work in the Detroit area with the exception of the polishing work for Ford Motor Company which had its own polishing plant.  *Id*.  The acquisition of the Ford business was a longstanding objective of the plaintiff.  *Id*.  When the plaintiff's president, the defendant, learned that Ford was considering ceasing its polishing operation, he brought it to the attention of the plaintiff's board of directors which instructed the defendant to investigate the matter.  *Id*. at 172-73.

The defendant contacted a Ford representative to discuss the plaintiff's handling of Ford's finishing business.  *Id*. at 173.  Ford's representative indicated that he was against the proposal because it would give the plaintiff a monopoly in the area.  *Id*.  During the discussion, the defendant asked if Ford would let him do the work in his individual capacity.  *Id*.  The defendant subsequently submitted a confidential proposal to buy Ford's equipment and provide polishing services to Ford.  *Id*.  The plaintiff then sued the defendant, alleging usurpation of a corporate opportunity, breach of fiduciary duties, and breach of contract.

15

At trial, the plaintiff unsuccessfully moved for judgment notwithstanding the verdict on its claims that the defendant breached his fiduciary duties and diverted a corporate opportunity. The Michigan Court of Appeals reversed the trial court's denial of the plaintiff's motion, holding that the defendant violated the law when he pursued the Ford polishing business and purchased the Ford equipment while serving as the plaintiff's president without disclosing his actions to his employer. *Id*. at 173-74. The court held that Ford's refusal to deal with the plaintiff did not relieve the defendant from liability when he failed to disclose the refusal to his principal. *Id*. at 175.

The evidence shows that LePage and Rigole used Plaintiffs' resources (such as, computers, staff, warehouse, and a forklift) to start up and run Bemas. LePage and Rigole did not inform their superiors that they were offering the same goods and services to Nedschroef Detroit's customers that Nedschroef Detroit offers when the customers indicated that Nedschroef Detroit's prices were too high or its delivery time too long. In fact, LePage and Rigole did not tell their superiors that they had started a competing business.

For these reasons, the Court concludes that Plaintiffs are entitled to summary judgment with respect to their breach of duty of loyalty (Count X) and breach of fiduciary duty and misappropriation of corporate opportunities (Count XI) claims against LePage and Rigole.

16

### B.      Misappropriation of Trade Secrets

To succeed on a claim for misappropriation of a trade secret under Michigan law, a plaintiff must prove: "1) the existence of a trade secret; 2) its acquisition in confidence; and 3) the defendant's unauthorized use of it." *Utilase, Inc. v. Williamson*,  Nos. 98-1233, 98-1320, 1999 WL 717969, at *6 (6th Cir. Sept. 10, 1999 (citing *Rothschild v. Ford Motor Co*., 2 F. Supp. 2d 941, 950 (E.D. Mich. 1998) (citing *Aerospace Am., Inc. v. Abatement Techs*., 738 F. Supp. 1061, 1069 (E.D. Mich.1990)).  The Michigan Uniform Trade Secrets Act ("MUTSA") defines a "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d).  Under MUTSA, "misappropriation" means one of the following:

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

17

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b).  The statute defines the term "improper means" to include "breach . . . of a duty to maintain secrecy . . .."  *Id*. § 445.1902(a).

Plaintiffs maintain that there is no genuine issue of material fact that Defendants misappropriated Plaintiffs' trade secrets, including its proprietary part drawings and confidential customer lists.  Defendants respond with evidence creating an issue of fact with respect to whether LePage and Rigole took proprietary drawings directly from Plaintiffs (and altered them) for use by Bemas or whether they instead received those drawings through customers or reverse engineering.[2]  Defendants also offer evidence creating an issue of fact with respect

---

[2] Plaintiffs urge the Court to disregard Defendants' evidence on these issues, relying on the tenet that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  (Defs.' Reply Br. at 4-5, citing *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Peterson v. Hall*, 2013 U.S. Dist. LEXIS 163225, at *8-9 n.3 (E.D. Mich. July 11, 2013).)  The present situation is quite unlike that in *Scott* and *Peterson*, however, where objective evidence in the record

to whether LePage and Rigole took an actual list of Nedschroef Detroit's

customers from Plaintiffs or were aware of those customers simply through their

tenure at Nedschroef Detroit.  Nevertheless, those factual issues are not material to

Plaintiffs' misappropriation claim, at least with respect to Plaintiffs' proprietary

drawings.[3]

Assuming Defendants' version of the events as true, some of the drawings

Bemas used were Plaintiffs' proprietary drawings which Defendants received from

their customers (i.e. former Nedschroef Detroit customers).  At least some of those

---

blatantly contradicted one party's version of the events or story.  *See Scott*, 550
U.S. at 380-81 (videotape of police chase contradicted the plaintiff's version of
events); *Peterson*, 2013 U.S. Dist. Lexis at *8-9 (MDOC records established that
the defendant was elsewhere and could not have been the person who allegedly
shut the plaintiff's hand in his cell door).  Here, LePage's and Rigole's testimony
is not "blatantly contradicted" by *objective* evidence.

[3] If Plaintiffs' misappropriation claim was premised only on their theory that
Defendants stole Plaintiffs' customer list and the trier of fact accepted Defendants'
evidence that LePage and Rigole identified potential Bemas customers based only
on the contacts they established during their employment in the industry, Plaintiffs
could not prevail on their misappropriation claim.  The Michigan Supreme Court
has held that "there is nothing improper in an employee establishing his own
business and communicating with customers for whom he had formerly done work
in his previous employment." *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 615
(Mich. 1984). "Thus, customer lists developed by a former employee and
information relating to a customer's needs are not 'trade secrets' under the
MUTSA, *McKesson Medical-Surgical Inc. v. Bio-Medics, Inc.*, 266 F. Supp. 2d
590, 597-98 (E.D. Mich.2003), unless the employee is bound by a confidentiality
agreement. *Hayes-Albion*, 421 Mich. at 184, 364 N.W.2d at 615." *Wysong Corp.
v. M.I. Indus.*, 412 F. Supp. 2d 612, 629 (E.D. Mich. 2005).  There is no evidence
that LePage or Rigole were bound by such an agreement.

customers received the drawings from Rigole and LePage when they worked for Nedschroef Detroit. (Pls.' Mot., Ex. 2 at 47, 54, 95, 195-96; Ex. 3 at 26.) Rigole and LePage acknowledged that those drawing were marked as confidential and could not be given to Nedschroef Detroit's customers, except in "exceptional circumstances" after consultation with Belgium. (*Id*. Ex. 2 at 26, 80; Ex. 3 at 27.) The drawings were only accessible through Plaintiffs' passcode protected server. Defendants in fact do not dispute that Plaintiffs' drawings constitute trade secrets.

The undisputed evidence suggests that Defendants acquired Plaintiffs' trade secrets knowing that those trade secrets were acquired through breach of a duty to maintain their secrecy. At the very least, Defendants knew that use of Plaintiffs' proprietary drawings was limited to a use which served Plaintiffs. Yet Defendants used those drawings for an unauthorized use-- i.e. to manufacture and sell parts to be sold by Bemas in direct competition with Nedschroef Detroit.

The Court therefore concludes that Plaintiffs are entitled to summary judgment with respect to their misappropriation claim (Count III).

## C.    Conversion

In their Complaint, Plaintiffs assert common law and statutory conversion claims. The first is established by showing "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600, 606 (Mich.

1992).  "Conversion may occur when a party properly in possession of property

uses it in an improper way, for an improper purpose, or by delivering it without

authorization to a third party."  *Dep't of Agric. v. Appletree Mktg. LLC*, 779

N.W.2d 237, 244-45 (Mich. 2010).

> Michigan's conversion statute provides, in pertinent part:
>
> (1) A person damaged as a result of either or both of the following
> may recover 3 times the amount of actual damages sustained, plus
> costs and reasonable attorneys' fees:
>
> (a) Another person's stealing or embezzling property or converting
> property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or
> aiding in the concealment of stolen, embezzled, or converted property
> when the person buying, receiving, possessing, concealing, or aiding
> in the concealment of stolen, embezzled, or converted property knew
> that the property was stolen, embezzled or converted.

Mich. Comp. Laws § 600.2919a.  In order to prevail on a claim for statutory

conversion, a plaintiff must satisfy the elements of a common law conversion

claim, as well as demonstrate that the defendant had "actual knowledge" of the

converting activity.  *See Echelon Homes, LLC v. Carter Lumber Co.*, 694 N.W.2d

544, 547-48 (2005) (holding that under Michigan's conversion statute,

"constructive knowledge is not sufficient; a defendant must know that the property

was stolen, embezzled, or converted.").

For the reasons discussed in the preceding sections, the undisputed evidence

establishes that Defendants converted Plaintiffs' proprietary drawings and other

21

property when they used the property to directly compete against Nedschroef Detroit.  There can be no dispute that Plaintiffs knowingly converted Plaintiffs' property.  As such, the Court concludes that Plaintiffs are entitled to summary judgment with respect to their conversion and statutory conversion claims (Counts V and VI).

### D.   The Lanham Act, Michigan Consumer Protection Act & Unfair Competition

Plaintiffs assert that Defendants' engagement in a competing business while employed by Nedschroef Detroit caused confusion with respect to the source of the goods and services provided to customers, thereby violating the Lanham Act, Michigan Consumer Protection Act ("MCPA"), and unfair competition under the common law.  As Plaintiffs assert, to obtain summary judgment on each of these claims, they must show that there is no genuine issue of material fact that Defendants alleged activities resulted in a "likelihood of confusion."  *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (holding that the "likelihood of confusion" test applies to claims for trademark infringement, unfair competition, and false designation brought under the Lanham Act); *Carson v. Here's Johnny Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir. 1983) (holding the same as to claims of unfair competition brought under Michigan common law); *Homeowners Grp. v. Home Mktg. Specialists*, 931 F.2d 1100, 1105 n. 1 (6th Cir. 1991) (holding the same as to claims brought under Michigan Consumer Protection Act).  Not all

22

conduct that causes a likelihood of confusion is prescribed by the Lanham Act or MCPA, however.

As relevant to Plaintiffs' false designation/false advertising claim under the Lanham Act, the statute imposes liability on "any person who, on or in connection with any goods or services . . . *uses* in commerce . . . any *false designation* of origin, *false or misleading description* of fact, or *false or misleading representation* of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(A) (emphasis added).  Plaintiffs do not allege that Defendants used a false designation of origin, a misleading description of fact, or made false or misleading representations of fact.  According to Plaintiffs, any confusion was simply caused by Rigole's and LePage's dual roles as representatives of Nedschroef Detroit and Bemas.  Thus Plaintiffs are not entitled to summary judgment with respect to their Lanham Act claim.

The MCPA provides *inter alia*:

(1) Unfair, unconscionable, or deceptive methods, acts, or practices *in the conduct of trade or commerce* are unlawful and are defined as follows:

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

Mich. Comp. Laws § 445.903 (emphasis added).  The MCPA specifically defines "trade or commerce" as "the conduct of a business providing goods, property, or

23

service *primarily for personal, family, or household purposes . . . .*"  Mich. Comp.

Laws § 445.902(1)(g) (emphasis added).  As the Michigan Supreme Court has

recognized: "the MCPA applies only to purchases by consumers and does not

apply to purchases that are primarily for business purposes . . . 'if an item is

purchased primarily for business or commercial rather than personal purposes, the

MCPA does not supply protection.' " *Slobin v. Henry Ford Health Care*, 666

N.W.2d 632, 634-35 (Mich. 2003) (quoting *Zine v. Chrysler Corp.*, 600 N.W.2d

384 (Mich Ct. App. 1999)).  The conduct giving rise to this action did not involve

consumer purchases; instead, they involved business or commercial transactions,

only.  Thus the MCPA is inapplicable.

On the other hand, it appears that Defendants' conduct does fall within the

proscriptions of a common law unfair competition claim.  *See In re MCI*

*Telecomm. Corp. Complaint*, 612 N.W.2d 826, 836 n.8 (Mich. Ct. App. 2000)

(providing that "the common-law doctrine of unfair competition was ordinarily

limited to acts of fraud, bad-faith misrepresentation, misappropriation, *or* product

confusion") (emphasis added); *see also Induct-O-Matic Corp. v. Inductotherm*

*Corp.*, No. 1982 WL 52120, at *12 (E.D. Mich. 1982) (citing *First Nat'l Bank &*

*Trust Co. of Kalamazoo v. First Nat'l Credit Bureau, Inc.*, 111 N.W.2d 880, 883

(Mich. 1961) and *Hemmeter Cigar Co. v. Congress Cigar Co.*, 118 F.2d 64 (6th

Cir. 1941)) (recognizing that it was not necessary for the plaintiff to prove fraud or

24

deliberate deception by the defendant to establish common law unfair competition. "The question in this unfair competition action is whether [the defendant's] conduct gives rise to a likelihood of confusion."). Thus as long as Plaintiffs demonstrate a likelihood of confusion, it appears that they are entitled to summary judgment on their unfair competition claim.

As stated earlier, the test for assessing likelihood of confusion in the context of a common law unfair competition claim is that test used for a Lanham Act claim. The Sixth Circuit Court of Appeals has articulated eight factors for making this assessment:

1. strength of the plaintiff's mark;

2. relatedness of the goods;

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. likely degree of purchaser case;

7. the defendant's intent in selecting the mark; and

8. likelihood of expansion of the product lines.

*Frisch's Rest., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). "These factors are not immutable, but merely indicate the need for weighted evaluation of the pertinent facts in arriving at the legal conclusion of

confusion." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985). Several of the factors are not relevant in the present case. Of those factors that are relevant, a sufficient number weigh in favor of finding a likelihood of confusion.

Specifically, Plaintiffs and Bemas do not simply sell related goods. Instead, as Defendants acknowledge, they sell the exact same goods and provide the exact same services. Nedschroef Detroit and Bemas used the same marketing channels: Rigole and LePage, in their dual capacities representing Nedschroef Detroit and Bemas. Finally, contrary to Defendants' assertion in response to Plaintiffs' motion, there is evidence of actual confusion in the marketplace-- i.e., suppliers of goods to Nedschroef Detroit and Bemas which were confused as to which entity placed a particular order. (*See* Pls.' Mot., Ex. 2 at 166-67, 177; Ex. 3 at 75-76, 98, 106-07; Exs. 19, 20, 22.) While Plaintiffs may not present evidence of confusion by buyers, this is not required. Further, the test is "*likelihood* of confusion", not "actual confusion." *See Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 108 (4th Cir. 1991) (quoting *Soweco Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185-86 (5th Cir. 1980) ("Though *Soweco* lists 'actual confusion' as one factor that courts must consider, it clearly states that 'proof of actual confusion is unnecessary; the *likelihood* of confusion is the determinative factor.' ") (emphasis

in original); *see also Squirt Co. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (same).

For these reasons, the Court concludes that Plaintiffs are not entitled to summary judgment with respect to their Lanham Act and MCPA claims (Counts I and II). However, Plaintiffs are entitled to summary judgment with respect to their common law unfair competition claim (Count IV).

### E.   Tortious Interference with Business Relationships and/or Expectancies of Business Relationships

Under Michigan law, a claim of tortious interference with a business expectancy requires proof of " 'the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional improper interference by the defendant inducing or causing a termination of the relationship or expectancy, and resultant damage to the plaintiff.' " *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assoc., Architects & Planners, Inc.*, 821 N.W.2d 1, 3 (Mich. 2012) (quoting *Dalley v. Dykema Gossett, PLLC*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010) (additional citations omitted)). Proof that the interference was "improper" can be shown by proving either "(1) the intentional doing of an act wrongful per se, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading [the] plaintiff['s] contractual rights or business relationship." *Advocacy Org. for Patients &*

27

*Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (citation omitted).

Defendants do not challenge Plaintiffs' evidence establishing the first three elements of this claim. Defendants argue, however, that Plaintiffs cannot establish the last element-- resulting damage-- because Bemas only provided parts for and/or serviced Nedschroef machines if customers previously requested a quote for the same part or service from Nedschroef Detroit and rejected the quote. The flaw in Defendants' argument is that before Rigole and LePage formed Bemas, there was only one source in North America for the majority of the parts needed for Nedschroef machines: Nedschroef Detroit. (Pls.' Mot., Ex. 1 ¶ 7.) Thus although Plaintiffs' customers may have asked LePage and Rigole for an alternative source to purchase those parts, if none had been offered, the customer would have had to purchase the parts from Nedschroef Detroit at the price quoted or go without the part. Presumably the latter option was not a realistic one where the customer relies on the parts to operate their Nedschroef machine.

The Court therefore concludes that Plaintiffs present evidence to demonstrate their entitlement to summary judgment on their tortious interference claim (Count VII).

28

**F.     Unjust Enrichment**

An unjust enrichment claim under Michigan law requires proof of the following: "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to [the] plaintiff because of the retention of the benefit by the defendant." *Erickson's Flooring & Supply Co. v. Tembec, USA, LLC*, 212 F. App'x 558, 564 (6th Cir. 2007) (quoting *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993)).  As addressed earlier, Plaintiffs establish that, at the very least, Defendants used Plaintiffs' employees, computers, warehouse, and equipment to start up and run Bemas.  Defendants also engaged in business on behalf of Bemas while employed by and receiving a wage from Nedschroef Detroit.  Through the use of Plaintiffs' resources, Defendants were able to obtain profits for Bemas.  It would be inequitable to allow Defendants to retain the financial benefit obtained through their use of Plaintiffs' resources.

Accordingly, Plaintiffs are entitled to summary judgment with respect to their unjust enrichment claim (Count VIII).

**G.     Civil Conspiracy**

Proof of a civil conspiracy in violation of Michigan law requires proof of " '(1) a concerted action (2) by a combination of two or more persons (3) to accomplish an unlawful purpose (4) or a lawful purpose by unlawful means.' " *Petroleum Enhancer, LLC v. Woodward*, 558 F. App'x 569, 580 (6th Cir. 2014)

(quoting *Mays v. Three Rivers Rubber Corp.*, 352 N.W.2d 339, 341 (Mich. Ct. App. 1984)).  "Under Michigan law, 'a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate actionable tort.' " *Id*. (quoting *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich. Ct. App. 1986).  During their depositions, Rigole and LePage testified that they decided, with their wives, to create Bemas to compete directly with Nedschroef Detroit.  As established earlier, this conduct was accomplished through unlawful means, such as LePage's and Rigole's breach of their fiduciary duties, misappropriation of corporate opportunities, and conversion of Plaintiffs' assets.

Plaintiffs therefore are entitled to summary judgment with respect to their civil conspiracy claim (Count IX).

## IV.   Relief

Plaintiffs seek a permanent injunction and damages, including treble damages, attorney's fees, and interest pursuant to Michigan's conversion statute. Plaintiffs also seek an evidentiary hearing to determine their economic damages from January 1, 2014 through the date any injunction is entered.

### A.   Permanent Injunction

A plaintiff prevailing on the merits may obtain a permanent injunction by showing:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to

30

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  The Court finds that these factors have been satisfied.

With respect to the first and second factors, "a plaintiff's harm is not irreparable if it is fully compensable by money damages.  However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  Defendants' conduct has caused a loss of goodwill and competitive market position for Plaintiffs (*see* Pls.' Mot., Ex. 1 ¶ 8)-- injuries which courts have recognized cannot be fully compensable by monetary damages. *See, e.g., Basicomputer Corp.*, 973 F.2d at 512; *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (finding irreparable injury where the defendant directly contacted the plaintiff's customers because, if "[the defendant] succeeds in luring [the plaintiff's] potential customer base to [the defendant's new employer], [the plaintiff] may never be able to recover that lost business[.]").

The balance of hardships favors an injunction precluding Defendants from continuing to unfairly compete against Plaintiffs.  Defendants acknowledge that Nedschroef machines make up only a small percentage of the fastener machines in

31

North America. (Pls.' Mot., Ex. 2 at 22 (Rigole testifying that Nedschroef's market share in North America is "not a huge one" and guessing that it is 10, 15 percent); Ex. 3 at 20 (LePage testifying that Nedschroef's share is "[a] couple percent"). Thus an injunction precluding Defendants from providing replacement parts for Nedschroef machines would leave substantial legitimate business for Defendants to seek. Plaintiffs, on the other hand, would continue to suffer harm if Defendants were permitted to continue with their unfair competition. Moreover, courts have discounted the harm to a defendant by an injunction where the defendant " 'knowingly and illegally placed itself in the position to be placed out of business.' " *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (quoting *Hickman v. Turitto*, No. 1:06-cv-151, 2007 WL 1080090, at *3 (E.D. Tenn. Apr. 9, 2007)); *see also Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) (discounting harm that the contemplated injunction would visit on the defendant, reasoning that it "is hardly a legally cognizable one: It would be prohibited from selling counterfeit products, an illegal act to begin with.").

Finally, the public interest is served by an injunction. The public has an interest in discouraging unfair competition. *Brake Parts*, 443 F. App'x at 33; *Hoover Transp. Services, Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir. 2003).

32

Thus the Court is entering a permanent injunction precluding Defendants from providing replacement parts or services for Nedschroef machines in North America.

### B.   Damages

Michigan courts have long recognized that an agent may forfeit his right to compensation under a contract for services when the agent engages in misconduct or grossly mismanages his principal's affairs. *See Toy ex rel Ketchum v. Lapeer Farmers Mut. Fire Ins. Ass'n*, 297 N.W. 230, 231-32 (Mich. 1941); *Sweeney & Moore*, 294 N.W. at 712-13; *Rippey v. Wilson*, 273 N.W. 552, 556 (Mich. 1937). As such, Plaintiffs are entitled to recover the wages they paid Rigole and LePage from the time they started Bemas through the date they were terminated.  Plaintiffs present evidence to show that, during this time frame, Plaintiffs paid Rigole $281,143 and LePage $286,749.  (Pls.' Mot., Ex. 26 at 4.)  Defendants do not dispute these calculations in response.

Michigan law also establishes that Plaintiffs are entitled to recover the profits Bemas gained as a result of LePage's and Rigole's breach of their fiduciary duties and usurpation of corporate opportunities.  *Central Cartage Co.*, 591 N.W.2d at 426 (quoting *Production Finishing*, 405 N.W.2d at 174) ("If an agent acquires any pecuniary advantage to himself from third parties by means of his fiduciary character, he is accountable to his employer for the profit made.").

33

According to Plaintiffs' evidence, Bemas' net profits from 2011 through 2013 were $393,971.  (Pls.' Mot., Ex. 26 at 4.)  Again, Defendants do not dispute these calculations in response.  Thus Plaintiffs are entitled to an award that includes this amount, plus any net profits established from 2013 forward.[4]

Michigan's conversion statute provides for an award of treble damages, plus costs and reasonable attorney's fees, to a plaintiff damaged by a defendant's conversion of property.  Mich. Comp. Laws § 600.2919a(1).  The statute states, in part: "[t]he remedy provided by this section is in addition to any other right or remedy the person may have at law or otherwise."  *Id*. § 600.2919a(2).  As the Court has found that Plaintiffs are entitled to summary judgment on their statutory conversion claim, it also concludes that they are entitled to treble damages, costs, and attorney's fees.[5]

---

[4] Plaintiffs request an evidentiary hearing to establish their additional damages from the end of 2013 forward.  The Court is hopeful that a determination of Bemas' net profits from the end of 2013 through the date of the Court's permanent injunction can be determined without the need for an evidentiary hearing.  Therefore, as set forth *infra*, the Court is ordering Defendants to comply with Plaintiffs' request for documentation relevant to this determination and is setting forth a briefing schedule to address those net profits, as well as Plaintiffs' reasonable attorney's fees and costs incurred in this action.  If Defendants do not cooperate and provide Plaintiffs with the documents needed to make this assessment, Plaintiffs may file an appropriate motion and sanctions may be imposed.

[5] As set forth in the preceding footnote, Plaintiffs shall file a brief in which they present proof of their reasonable attorney's fees and costs incurred in this action.

## V.     Conclusion

For the reasons stated, the Court holds that Plaintiffs are entitled to summary judgment with respect to all of their claims against Defendants, except their claims alleging violations of the Lanham Act and Michigan Consumer Protection Act (Counts I and II).  The Court further holds that Plaintiffs are entitled to a permanent injunction and damages representing (a) the wages Nedschroef Detroit paid to LePage and Rigole while they were operating Bemas and (b) Bemas' net profits.  Finally, the Court concludes that Plaintiffs are entitled to treble damages, attorney's fees, and costs.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that within twenty-one (21) days of this Opinion and Order, Defendants shall provide Plaintiffs with all documentation relevant to determining Bemas' net profits from the end of 2013 until the date of this Opinion and Order.  Plaintiffs may then file a motion, seeking damages for the additional profits and the amount of any attorney's fees they are seeking. Defendants may respond to Plaintiffs' motion within fourteen (14) days of its

filing.  The Court then will decide the motion and enter a judgment that includes

the damages to which it finds Plaintiffs entitled.

s/ Linda V. Parker      
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: May 22, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, May 22, 2015, by electronic and/or U.S.
First Class mail.

s/ Richard Loury      
Case Manager
